IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LKRB INDUSTRIES, LLC *doing business as*
HAPPY GRANDPA,

        *Plaintiff*,

   v.

xuzhouaiyaxundianzishangwuyouxiangongsi,
*et al*,

        *Defendants*.

Civil Action No. 2:24-cv-1601

Hon. William S. Stickman IV

## <u>MEMORANDUM OPINION</u>

WILLIAM S. STICKMAN IV, United States District Judge

 Plaintiff LKRB Industries, LLC ("LKRB") filed a Motion to Enforce Settlement (ECF No. 242) against Defendant Deng Shaojun d/b/a RxmentDirect US ("Defendant No. 28") requesting that the Court enforce a purported settlement agreement between itself and Defendant No. 28. Defendant No. 28 filed a Memorandum in Opposition to Plaintiff's Motion to Enforce Settlement. (ECF No. 251). For the following reasons, the Court will deny LKRB's motion.

## I. FACTUAL BACKGROUND

 LKRB filed a complaint for damages and injunctive relief against numerous defendants, including Defendant No. 28, alleging they violated 35 U.S.C. § 271 by infringing on LKRB's patent (ECF No. 3, ¶¶ 68-79) and 15 U.S.C. § 1125(a) through unfair, deceptive, and fraudulent marketing (*id*. ¶¶ 80-86). On January 2, 2025, an attorney with JunQian Law Firm ("Attorney One") reached out to LKRB's counsel via email stating that:

> My law firm represents my client in communicating with your firm regarding case
> 24-cv-1601. My client is suspected of infringement and has now been listed as a
> defendant. My client first apologizes for the infringement caused and believes that

we can reach a settlement and resolve this case through communication.  Looking forward to your reply.

(ECF No. 243-1, p. 9).  LKRB responded and proposed the following settlement offer:

(1) payment of ▇ % of the restrained funds ($22,377.19), calculated based on the restrained assets at the time the defendant signs the settlement agreement, so the sooner they settle the less it costs them.  This component releases the defendant from all past liability for infringement and false marketing claims; and (2) ▇ % royalty rate moving forward with a requirement to mark products covered by the Asserted Patent **OR** an agreement to not sell infringing products in the future.

(*Id*. at 8) (emphasis and redaction in original).  Attorney One countered with the following offer: "[W]e propose that we can use ▇% of the frozen funds, which is $16[,]782.75, to facilities [sic] settlement of this case?"  (*Id*. at 7) (redaction in original).  LKRB responded: "That is acceptable to us."  (*Id*. at 6).  The parties continued to communicate regarding other facets of the proposed settlement.  Other communications mentioned the proposed settlement amount.  For example, on January 11, 2025, Attorney One sent an email to LKRB summarizing:

1: If a separate settlement is reached in this case, the amount will be $16[,]782.75, but no similar or infringing products can be sold again.  If brand authorization is added in addition to the case settlement, the settlement amount will still be $16[,]782.75, plus ▇% of the future brand product sales amount (calculated after deducting Amazon's fees).  I have 4 questions now 1: Can we use the current frozen balance in our store to deduct the settlement amount for this case?  After all, there is too much cash of $16[,]782.75 for my client to wire directly.  2: Assuming we have reached an authorized cooperation, may I ask if the payment method for this ▇% authorization fee is quarterly or monthly?  Is it necessary to send Amazon's sales records to your law firm for verification when paying this fee?  3: How long is the effectiveness of brand authorization?  4: Is it only necessary to indicate the relevant identification when selling related products?

(*Id*. at 4) (redaction in original).  On January 11, 2025, Tomoko Itsukaichi ("Attorney Two") reached out to LKRB stating:

Our office is assisting [Defendant No. 28] in the above-referenced lawsuit to facilitate a resolution. We understand you represent Plaintiff . . . .  In order to settle the dispute quickly to avoid unnecessary legal fees and expenses, we request that you kindly provide Plaintiff's settlement terms. Please also provide your evidence showing alleged infringement by Defendant.

(*Id.* at 14).  LKRB responded to Attorney Two: "Thank you for your email. I appreciate you reaching out[,] but we were already contacted by the company's counsel." (*Id.* at 13).

On January 13, 2025, at 2:39 a.m., after LKRB was contacted by Attorney Two, Attorney One communicated with LKRB: "My client still feels that currently they only choose the settlement case and do not choose the authorization option.  Please provide me with a settlement agreement, according to our agreed amount of $16[,]782.75." (*Id.*).  On the same day, at 3:58 a.m., LKRB received an email from Attorney Two stating: "I confirm that now I represent the seller for the settlement negotiation.  Please kindly forward me your evidence showing the alleged infringement. Please also provide Plaintiff's settlement terms." (*Id.* at 13).

On January 17, 2025, LKRB received an email from Nick Makridakis ("Attorney Three") stating: "We represent [Defendant No. 28] for settlement negotiations in the above-referenced lawsuit.  To get things going, could you please provide us with evidence from your side showing alleged infringement and also provide us with your client's settlement terms." (*Id.* at 18).  LKRB responded that Attorney Three was the "third person" that it corresponded with that was representing Defendant No. 28.  (*Id.* at 17).  It encouraged Attorney Three to access the initial case filings via a Dropbox link and ECF.  (*Id.*).  Attorney Three responded: "Sorry about the confusion. I can confirm that we're the ones actually representing the seller now.  That being said, would you mind please sending over your initial settlement offer?  I can send it over to the seller ASAP and let you know his thoughts." (*Id.*)  On January 24, 2025, LKRB responded: "[T]here was an agreement to resolve the matter at $16,782.75 plus a reasonable royalty depending on if your client wanted to continue sales.  That predated your involvement of course and also predated me receiving the sales data from Amazon last week." (*Id.* at 16).  LKRB included a chart in its email to Attorney Three showing the allegedly infringing sales by Defendant No. 28 on Amazon.  (*Id.*).

LKRB then noted: "A percentage of that amount would be equally significant[,] so my suggestion is for you and your client to dismiss and let me know your preference.  The bottom line is we are open to discussing a resolution."  (*Id*.).

On February 9, 2025, LKRB received an email from Mainleaf Law Group ("Attorney Four") stating: We are retained by [Defendant No. 28] in this case.  Would you please forward evidence and advise?"  (*Id*. at 23).  After some back and forth correspondence with LKRB, Attorney Four stated: "However, client reported they previously received a $16,000 offer from your side.  We are authorized to settle this matter for $10,000."  (*Id*.).  Subsequently, on March 5, 2025, Attorney Four stated "Client refused to get back to us and we no longer represent this store."  (*Id*. at 37).

> On March 8, 2025, Defendant No. 28 reached out directly to LKRB's counsel stating:
>
> Previously, I had entrusted other attorneys to communicate with you on my behalf, and they informed me that you believed we had reached a settlement agreement for $16,782.75 quite some time ago.  Please see the attached document for reference.  However, I was unaware of this matter entirely and am unsure if there has been a misunderstanding.  In any case, I am reaching out to you directly now as the actual defendant, not through legal representation.  I would like to personally discuss the settlement amount with you.  As a small-scale seller with very thin profit margins, I kindly ask if you might consider showing some leniency and accepting a settlement of $5,000 instead.

(*Id*. at 28); (*see also id*. (emailing LKRB's counsel on March 12, 2025, stating: "I would greatly appreciate any update on whether my proposal of $5,000 is acceptable.").  LKRB responded on March 12, 2025:

> Thanks for your email but will not accept your settlement offer of $5,000. We are not open to settlement with you at this time.  We had an agreement at $16,000 with your first counsel.  The next two counsel did not honor that agreement and you do not intend to honor that agreement so we will resolve this issue through the court.  Additionally, the sales data from Amazon indicates your company has over ███ in infringing sales so a resolution at $5,000 is unacceptable.

(*Id*. at 27) (redaction in original). On March 13, 2025, Defendant No. 28 responded, again stating that it was not fully informed regarding the previous purported settlement agreement and offering a "revised" settlement amount of $10,000. (*Id*. at 26-27). LKRB answered stating that it would not accept the settlement offer of $10,000 and that it was "not open to settlement with [Defendant No. 28] at this time." (*Id*. at 25).

On March 18, 2025, Attorney Four again reached out to LKRB stating: "We are retained by [Defendant No. 28] in this case. Would you please forward evidence and advise?" (*Id.* at 36). LKRB responded: "This is the same client on the same case (and thus the same evidence) that we've emailed about previously. I'm attaching your prior email by way of reminder." (*Id.*). LKRB provided the Dropbox link containing relevant filings to Attorney Four. (*Id.* at 46). LKRB then stated: "If you now represent this Defendant in fact, you can tell it to honor the already-agreed upon terms for resolution (~$16.7k) or LKRB will proceed with the litigation (including a motion to enforce settlement)." (*Id*. at 45). Attorney Four responded: "The client said he didn't know about the prior settlement, and we suspect there might be some miscommunication via prior counsel." (*Id*. at 44). After further emails were exchanged, Attorney Four stated:

> I spoke to the client again, and to cut the chase, the maximum he's willing to settle at this point is a $5,000 payment and a covenant not to interfere with his future sale of the accused product. If this isn't acceptable, I don't believe the parties can settle now and we need to find other opportunities down the road.

(*Id*. at 43). On April 3, 2025, LKRB responded to Attorney Four:

> Aside from the agreement litigation counsel secured with your client's prior counsel for "our agreed amount of $16[,]782.75" (see attached email of 01/13/2025) and detailing "an agreement to resolve the matter at $16,782.75 plus a reasonable royalty" (see attached email of 01/24/2025), your client made a direct offer to litigation counsel: "I would like to propose a revised settlement offer of $10,000" (see attached email of 03/12/2025). Further, **your firm made us an offer** "to settle this matter for $10,000" (see attached email of 02/26/2025 at 3:25 am). All of this was previously detailed to you when we explained our rejection of your $10,000 offer (see attached email from Gabriel Opatken of 02/26/2025 at 2:27 pm). Your

response to this was that you no longer represented the client (see attached email of 03/05/2025).  Then your client reached out directly to litigation counsel, again offering $10,000 (see above).  The fact of the matter is we consider your and your client's **two previous offers** of $10,000 as a floor.

(*Id*. at 42) (emphasis in original).  On May 8, 2025, LKRB filed a motion seeking to enforce the alleged settlement agreement with Defendant No. 28 for $16,782.75.  (ECF No. 242).  No notice of dismissal, stipulated dismissal, or settlement agreement was ever filed with the Court.

Shaojun Deng ("Deng"), registrant of the Amazon storefront referred to as Defendant No. 28, filed a sworn declaration stating that Attorney One was hired on January 2, 2025, and discharged on January 10, 2025.  (ECF No. 251-1, p. 1).  On January 10, 2025, Defendant No. 28 retained Attorney Two.  (*Id*.).  It discharged Attorney Two on January 31, 2025.  (*Id*.).  Deng stated: "At no point did I authorize anyone to accept the settlement offer of $16,782.75."  (*Id*.).  Deng attached text messages that he apparently exchanged with Attorney One.  (ECF No. 251-1, p. 4).  These text messages are in Chinese, not dated, and contain no information showing the sender or the recipient of the messages.  Deng provided the following translation of the messages:

OK.

Why is the service fee so high? Isn't it RMB 2000?
It's a lot more than that since it's in US dollars.

It can't be done. You may look at the settlement and offer of other service providers first.

1/10/25 11:22

(*Id*. at 7).  It is unclear which messages belong to Deng and which messages belong to Attorney One.

## II.    STANDARD OF REVIEW

The Court has jurisdiction to enforce a settlement agreement in a pending case. *Maya Swimwear Corp. v. Maya Swimwear, LLC*, 855 F. Supp. 2d 229, 233 (D. Del. 2012).  The standard of review for a motion to enforce a settlement agreement is well established.[1]  "The stakes in summary enforcement of a settlement agreement and summary judgment on the merits of a claim are roughly the same—both deprive a party of his right to be heard in the litigation." *Tiernan v. Devoe,* 923 F.2d 1024, 1031 (3d Cir. 1991).  To prevail on a motion to enforce a settlement, the movant must demonstrate that there are no disputed material facts regarding the terms and existence of the settlement contract.  *Id*. at 1031–32.   A court "must treat all the non-movant's assertions as true, and 'when these assertions conflict with the movant, the former must receive the benefit of the doubt.'"  *Leonard v. Univ. of Del.,* 204 F. Supp. 2d 784, 786 (D. Del. 2002) (quoting *Tiernan,* 923 F.2d at 1032).   If material facts are in dispute as to the existence or terms of an agreement to settle, a court should not grant a motion to enforce a settlement agreement without holding an evidentiary hearing.  *Tiernan*, 923 F.2d at 1031.  By contrast, "no hearing is necessary where there is no dispute as to the existence of a settlement." *Id*. (citing *Petty v. Timken Corp.*, 849 F.2d 130, 132 (4th Cir. 1988)).

## III.    CHOICE OF LAW

A threshold question is which forum's law the Court should apply to determine whether the purported settlement agreement is enforceable.  Since LKRB alleges violations of 35 U.S.C. § 271 and 15 U.S.C. § 1125(a), there is federal question jurisdiction over this litigation.  Nevertheless, the construction and enforcement of settlement agreements is governed by principles

---

[1] "Settlement agreements are encouraged as a matter of public policy because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by courts."  *D.R. by M.R. v. East Brunswick Bd. Of Educ.*, 109 F.3d 896, 901 (3d Cir. 1997).

of state law. *See Riffin v. Consol. Rail Corp.*, 363 F. Supp. 3d 569, 575 (E.D. Pa. 2019), *aff'd*, 783 F. App'x 246 (3d Cir. 2019) ("When a federal court exercises federal question jurisdiction, as is the case here, the court must apply the choice-of-law rules of the forum state."). For the purposes of adjudicating this motion, the Court must determine which state's substantive law applies by looking to the choice-of-law rules of the forum state, Pennsylvania. *Shuder v. McDonald's Corp.*, 859 F.2d 266, 269 (3d Cir. 1988) (internal citations omitted). In determining which state's law applies in contract disputes, Pennsylvania courts use the "most significant relationship" test, which qualitatively weighs the parties' contacts with the forums "according to their relation to the policies and interests underlying" the issues in dispute. *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 231 (3d Cir. 2007); *Am. Contract Bridge League v. Nationwide Mut. Fire Ins. Co.*, 752 F.2d 71, 74 (3d Cir. 1985) (discussing *Griffith v. United Air Lines, Inc.*, 203 A.2d 796 (Pa. 1964)).

LKRB is a limited liability company formed and existing under the laws of Idaho with a principal place of business in Garden City, Idaho. (ECF No. 3, ¶ 1). Defendant No. 28 is a registered storefront on Amazon that is accessed and controlled by Deng, a resident of Shenzhen, China. (ECF No. 251-1, p. 1). Defendant No. 28 can and does ship products to consumers in Pennsylvania and "derive[s] substantial revenue from [its] business transactions in Pennsylvania." (ECF No. 3, ¶¶ 37, 66). This action was filed by LKRB in the Western District of Pennsylvania. (*See generally id.*).

Neither LKRB nor Defendant No. 28 address the choice-of-law issue. Both parties seem to assume that Pennsylvania law applies and focused their briefs accordingly. (*See* ECF No. 243, p. 4); (ECF No. 251, p. 2). The Court sees no reason to sua sponte engage in a choice-of-law analysis. *See Williams v. BASF Catalysts LLC*, 765 F.3d 306, 317 (3d Cir. 2014) ("[P]arties may waive choice-of-law issues."); *Osby v. A & E Television Networks and Kurtis Productions, Ltd.*,

No. CIV. A. 96-7347, 1997 WL 338855, at *3 (E.D. Pa. Jan.17, 1997) ("Where the parties have

agreed to apply Pennsylvania law and Pennsylvania has an interest in the outcome of the litigation,

there is no reason for the court, 'sua sponte, to challenge the parties' consensual choice of law.'"

(internal citations omitted)); *Wiener v. AXA Equitable Life Ins. Co*., 58 F.4th 774, 779-82 (4th Cir.

2023) (holding that it was an error of law for the district court to sua sponte engage in a choice-of-

law analysis not addressed by either party).  While other forums, including Idaho, have a potential

interest in this litigation, the Court finds that the parties have waived the choice-of-law issue by

failing to raise it and only addressing Pennsylvania law in their pleadings related to the purported

settlement agreement.    The parties have thus implicitly consented to the application of

Pennsylvania law.[2]

## IV.    ANALYSIS

### 1.    Contract Formation

LKRB argues that there is an enforceable settlement agreement because the parties

manifested an intention to be bound by the agreement, and its terms are sufficiently definite so as

to be specifically enforceable.  (ECF No. 243, p. 5).  It contends that an agreement was reached

regarding a settlement amount on January 11, 2025, and the cessation of sales on January 13, 2025.

(*Id.*).  Even assuming Attorney One had the authority to enter into a settlement agreement on behalf

of Defendant No. 28,  the first question is whether the communications between Attorney One and

LKRB created an enforceable contract.  The Court holds that they did not.  The communications

---

[2] *See, e.g., Patterson v. GlaxoSmithKline Pharm. Co*., 2007 WL 966742, at *4 (E.D. Pa. Mar. 27, 2007) ("Our jurisdiction in this case is predicated upon the presence of a federal question. However, we apply Pennsylvania law to this issue [related to authority to settle] because the settlement of a lawsuit and the relationship between an attorney and his or her client are areas traditionally governed by state law and there is no conflicting federal interest." (internal quotation marks omitted)).

between Attorney One and LKRB do not demonstrate that LKRB and Defendant No. 28 manifested an intent to be bound by sufficiently definite terms.  Instead, the emails were mere negotiations to enter an agreement in the future.

The party relying on a contract—in this case, LKRB—has the burden of proving its existence.  *See Edmondson v. Zetusky*, 674 A.2d 760, 764 (Pa. Commw. 1996).  In determining whether a contract was formed, the Court must consider whether (1) both parties manifested an intention to be bound by the agreement; (2) the terms of the agreement were sufficiently definite to be enforced; and (3) there was consideration.  *Channel Home Ctrs. v. Grossman*, 795 F.2d 291, 298–99 (3d Cir. 1986) (citing *Lombardo v. Gasparini Excavating Co*., 123 A.2d 663, 666 (Pa. 1956)).  At issue here is whether the parties manifested an intent to be bound and whether the terms of the agreement were sufficiently definite.

"Under Pennsylvania law, 'where the facts are in dispute, the question of whether a contract was formed is for the jury to decide.'"  *Quandry Sols. Inc. v. Verifone Inc*., No. 07-097, 2009 WL 997041, at *5 (E.D. Pa. Apr. 13, 2009) (quoting *Ingrassia Constr. Co. v. Walsh*, 486 A.2d 478, 482 (Pa. Super. 1984)). "However, '[t]he question of whether an undisputed set of facts establishes a contract is a matter of law.'"  *Id.* (quoting *Mountain Props., Inc. v. Tyler Hill Realty Corp*., 767 A.2d 1096, 1101 (Pa. Super. 2001)); *see also Legendary Art, LLC v. Godard*, 888 F. Supp. 2d 577, 585 (E.D. Pa. 2012) ("The question of whether an undisputed set of facts establishes a contract is typically one of law, but where the facts are in dispute, the question is for the jury to decide." (internal citations omitted)).

"For a contract to be enforceable, the nature and extent of the mutual obligations must be certain, and the parties must have agreed on the material and necessary details of their bargain."  *Lackner v. Glosser*, 892 A.2d 21, 30 (Pa. Super. 2006).  "In assessing intent, the object of the

inquiry is not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior." *Landan v. Wal-Mart Real Est. Bus. Trust*, No. 12-926, 2015 WL 1491257, at *6 (W.D. Pa. Mar. 31, 2015).  "While in some instances an exchange of e-mails . . . between parties, may be sufficient to establish a contract, such exchanges do not always rise to the level of enforceable agreements." *Reynolds Packaging KAMA, Inc. v. Inline Plastics Corp*., No. 08-1902, 2011 WL 5089500, at *8 (M.D. Pa. Oct. 25, 2011).  The party contending that a contract has been formed must do more than show "preliminary negotiations or an agreement to enter into a binding contract in the future; to succeed, the party must prove that a mutual intent to be bound manifested, even though it was not memorialized in [a formal] writing." *Bennett v. Itochu Int'l, Inc*., 2012 WL 3627404, at *16 (E.D. Pa. Aug. 23, 2012); *see also Reynolds*, 2011 WL 5089500, at *8 ("Pennsylvania courts agree that '[a]n agreement to agree is incapable of enforcement.'" (quoting *Highland Sewer and Water Auth. v. Forest Hills Municipal Auth*., 797 A.2d 385, 390 (Pa. Commw. Ct. 2002))).  "Thus, the mere statement of an aspirational goal to reach some future agreement is not an enforceable contract in Pennsylvania." *Reynolds*, 2011 WL 5089500, at *8 (citing *Channel Home Ctrs*., 795 F.2d at 298; *see also ATACS Corp. v. Trans World Commc'ns, Inc*., 155 F.3d 659, 666 (3d Cir. 1998) ("[I]t is well established that evidence of preliminary negotiations or a general agreement to enter a binding contract in the future fail as enforceable contracts because the parties themselves have not come to an agreement on the essential terms of the bargain and therefore there is nothing for the court to enforce.").

As to the second element of contract formation — sufficiently definite terms — Pennsylvania has adopted the Restatement (Second) of Contracts.  *Reed v. Pittsburgh Bd. of Pub. Educ*., 862 A.2d 131, 135 (Pa. Commw. Ct. 2004). The Restatement provides:

(1) Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.

(2) The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.

(3) The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.

Restatement (Second) of Contracts § 33 (A.L.I. 1981); *see also Lackner*, 892 A.2d at 30 ("An enforceable contract requires, among other things, that the terms of the bargain be set forth with sufficient clarity." (internal citations omitted)). "Incompleteness of terms is one of the primary reasons statements of preliminary negotiations are not deemed offers." *Legendary Art*, 888 F. Supp. 2d at 586 (quoting *Reed*, 862 A.2d at 135). "[V]ague statements that fail to include material terms, are indicia that agreements are too uncertain to be enforced." *Sloan v. Frascella*, 2013 WL 4433366, at *3 (E.D. Pa. Aug. 16, 2013) (collecting cases finding agreements too indefinite to be enforced). "The more important the uncertainty, the stronger the indication is that the parties do not intend to be bound." Restatement (Second) of Contracts § 33, cmt. f (A.L.I. 1981). The fact that an agreement omits an essential term, "does not vitiate contract formation if the parties otherwise manifested their mutual assent to the agreement and the terms of that agreement are sufficiently definite." *ATACS Corp.*, 155 F.3d at 667 (internal citations omitted). However, "[w]here . . . there is no agreement or even a discussion as to *any* of the essential terms of an alleged bargain, such as time or manner of performance, or price or consideration, the 'agreement' is too indefinite for a party to reasonably believe that it could be enforceable in an action at law." *Lackner*, 892 A.2d at 31 (emphasis in original). As a matter of law, courts "may not provide a reasonable term where an essential term is left open." *Sloan*, 2013 WL 4433366, at *3 (citing

*Morris v. Ace Med. Co*., 1996 WL 69400, at *6 (E.D. Pa. Feb. 16, 1996) *aff'd*, 96 F.3d 1433 (3d

Cir. 1996)).

Applying the foregoing principles to the undisputed evidence in this case, the Court finds

that the emails between LKRB and Attorney One did not create an enforceable contract.  No

reasonable fact finder could conclude that the parties manifested an intent to be bound by the

alleged agreement.  Attorney One emailed LKRB: "[W]e propose that we can use ██% of the

frozen funds, which is $16[,]782.75, to facilitate the settlement of this case?"  (ECF No. 243-1, p.

7) (redaction in original).  LKRB responded: "That is acceptable to us. Does your client wish to

continue selling the products at a ██% royalty (or something lower if needed) or does your client

plan on stopping selling?"  (*Id.* at 6) (redaction in original).  Attorney One then continued

discussing the percentage ratio stating: "Does this ██% ratio mean that my clients will have to give

the brand a ██% sales revenue for every product they sell in the future?"  (*Id.*) (redaction in

original).  LKRB responded: "It would be ██% of the net sales (meaning the amount after Amazon

fees are deducted). We can do ██% if that's better for your client. It would be addressed in the

settlement agreement too."  (*Id.* at 5) (redaction in original).  At this point, Attorney One sent

LKRB a list of questions regarding the potential settlement agreement:

> 1: If a separate settlement is reached in this case, the amount will be $16[,]782.75,
> but no similar or infringing products can be sold again.  If brand authorization is
> added in addition to the case settlement, the settlement amount will still be
> $16[,]782.75, plus ██% of the future brand product sales amount (calculated after
> deducting Amazon's fees). I have 4 questions now 1: Can we use the current frozen
> balance in our store to deduct the settlement amount for this case?  After all, there
> is too much cash of $16[,]782.75 for my client to wire directly.  2: Assuming we
> have reached an authorized cooperation, may I ask if the payment method for this
> ██% authorization fee is quarterly or monthly?  Is it necessary to send Amazon's
> sales records to your law firm for verification when paying this fee?  3: How long
> is the effectiveness of brand authorization?  4: Is it only necessary to indicate the
> relevant identification when selling related products?

(*Id*. at 4) (redaction in original).  Attorney One's final correspondence with LKRB requested: "Please provide me with a settlement agreement, according to our agreed amount of $16[,]782.75." (*Id*.).

These email communications make clear that while the parties may have agreed on a settlement amount, $16,782.75, the parties were still engaged in negotiations regarding other material terms of the settlement agreement, including whether Defendant No. 28 would stop selling the allegedly infringing product or pay a royalty for every product sold.  LKRB contends that Attorney One's January 13, 2025, email stating: "My client still feels that currently they only choose the settlement case and do not choose the authorization option" created an agreement as to the cessation of sales (as opposed to Defendant No. 28 continuing sales with a royalty payment to LKRB).  (*See* ECF No. 243, p. 5).  The Court does not view this email as creating an agreement as to the cessation of sales.  Any argument that it did is undermined by LKRB's January 24, 2025, email to Attorney Three offering to negotiate a reasonable royalty rate if Defendant No. 28 wished to continue sales.  (*Id*. at 16).

If Defendant No. 28 elected to pay a royalty, there was no agreement as to what percentage the royalty would be, or when and how it would be paid.  The parties' communications regarding the proposed settlement amount of $16,782.75 establish that the parties expected future negotiations regarding other material terms of a settlement agreement, including the possibility of a royalty percentage for future sales.  While an enforceable contract may be formed through email communications, the fact that a formal written settlement agreement was discussed but never circulated to Defendant No. 28 provides further support for the conclusion that the parties were engaged in mere negotiations or preliminary discussions regarding a settlement agreement.  While the Court acknowledges LKRB's frustration with Defendant No. 28's shifting counsel and

settlement positions, "an agreement to agree," like what existed here, "is incapable of enforcement." *See Reynolds*, 2011 WL 5089500, at *8 (citing *Highland Sewer*, 797 A.2d at 390).

LKRB's contention that its emails with Attorney One formed an enforceable settlement agreement is undercut by its communications with subsequent counsel. For example, in communications with Attorney Three, after the settlement agreement was allegedly formed with Attorney One, LKRB offered to renegotiate the "$16,782.75 plus a reasonable royalty" settlement amount. (*See* ECF No. 243-1, p. 16 (stating that a percentage of the Amazon sales data would be "equally significant" to the $16,782.75 proposed settlement amount and recommending to Attorney Three: "my suggestion is for you and your client to discuss and let me know your preference. The bottom line is we are open to discussing a resolution.")).

On April 3, 2025, LKRB's communications with Attorney Four left some ambiguity as to whether LKRB was interested in renegotiating the settlement amount. For example, LKRB referenced the prior purported agreement for $16,782.75 with Attorney One, but also indicated that it considered Defendant No. 28's prior two offers of $10,000 "as a floor." (*Id*. at 42). These communications seemingly indicate that LKRB was still willing to engage in discussions with Attorney Four regarding the settlement amount. LKRB even refers to its prior discussions with Defendant No. 28 and its counsel as "offers," not settlement agreements. (*Id*. ("Again, this is becoming unreasonable to explain to you that *the previous offers* you and your client made were significantly higher than what is being offered now. As previously stated, if you and Defendant 28 are disavowing *your prior settlement offers*, we will be left with no choice but to go down that road with the Court.) (emphasis added)); (*see also id*. ("As part of going forward if this cannot be resolved, we request production of ALL communications (including otherwise privileged communications) that relate to and/or refer *to prior settlement offers* as well as ALL

communications that relate to and/or refer to the alleged miscommunication with prior counsel."
(emphasis added))).

In sum, the Court finds that the emails exchanged between LKRB and Attorney One did
not form an enforceable contract – even assuming Attorney One had the authority to enter into a
settlement agreement. There is no evidence that the parties intended to be bound by the $16,782.75
proposed settlement amount. There is no signed or proposed formal settlement agreement. The
only basis for LKRB's contention that there is an enforceable settlement agreement is the emails
exchanged between the parties. These emails reflect preliminary settlement discussions or
negotiations. They do not reflect an intent to enter an enforceable agreement. *See Legendary Art*,
888 F. Supp. 2d at 587 (finding no intent to be bound where "the parties behaved as though they
were engaged in negotiations, and not as if an agreement had been finalized").

Further, the terms of the agreement are not sufficiently definite to form an enforceable
contract. The only term purportedly agreed upon by the parties is the settlement amount. There
is no agreement as to whether Defendant No. 28 will cease selling the infringing product or pay a
royalty, what constitutes a reasonable royalty, how the payments are to be paid, the frequency of
the payments, or the length of the authorization. It defies reason to suggest that the parties would
have agreed to be bound by an agreement that omitted any mention of such material terms.
Moreover, the indefiniteness of the purported agreement means that determining whether a breach
occurred, or determining an adequate remedy, would require the court to supply terms that the
parties never agreed upon. *See, e.g., Sloan*, 2013 WL 4433366, at *4 ("Because [plaintiff] has
failed to identify the material terms of the agreement, such as what her alleged 5% interest entitled
her to, under what circumstances any profits would be distributed, and how those profits would be
determined, there is no way to determine whether Defendants breached the agreement or what

16

action would provide [plaintiff] an adequate remedy."); *Legendary Art*, 888 F. Supp. 2d at 588 (finding alleged oral agreement unenforceable where the alleged promises consisted of generalities and the material terms were undefined); *Lackner*, 892 A.2d at 32 ("This Court is prohibited . . . from writing a contract for the parties when they themselves have failed to agree to essential terms." (internal citations omitted)).

2.    Attorney Authority to Enter a Settlement Agreement

Defendant No. 28 contends that it never authorized Attorney One to accept the terms of the purported settlement agreement. (ECF No. 251, p. 1). Thus, it cannot be bound by the settlement. (*Id*.). The Court holds that even if the emails between Attorney One and LKRB formed an enforceable settlement agreement, Attorney One did not have the authority to enter into a settlement agreement on behalf of Defendant No. 28.

While a settlement agreement need not be reduced to writing, an attorney must still have authority to settle their client's case. "The ordinary employment of an attorney to represent a client with respect to litigation does not confer upon the attorney the implied or apparent authority to bind the client to a settlement or compromise, and the attorney cannot do so in the absence of such express authority." *King v. Driscoll*, 296 A.3d 1178, 1184 (Pa. Super. 2023) (citing *Baribault v. Zoning Hearing Bd. of Haverford Twp*., 236 A.3d 112, 122 (Pa. Cmwlth. 2020)). The Pennsylvania Supreme Court explained this unambiguous rule as follows:

> The law in this jurisdiction is clear and well-settled that an attorney must have express authority in order to bind a client to a settlement agreement. The rationale for this rule stems from the fact that parties settling legal disputes forfeit substantial legal rights, and such rights should only be forfeited knowingly. As such, a client's attorney may not settle a case without the client's grant of express authority, and such express authority can only exist where the principal specifically grants the agent the authority to perform a certain task on the principal's behalf.

*Reutzel v. Douglas, M.D.*, 870 A.2d 787, 791-92 (Pa. 2005) (internal citations omitted). As a result, "if the existence of a settlement is in dispute because it is claimed that the attorney lacked authority to bind his client, the attorney's authority . . . to bind [his] client by way of agreement or compromise is not inferred but must be proven." *King*, 296 A.3d at 1184 (citing *Brannam v. Reedy*, 906 A.2d 635, 640 (Pa. Cmwlth. 2006)). A settlement agreement is not binding in Pennsylvania if the attorney only had implied actual authority or apparent authority to enter into a settlement on behalf of their client. *Reutzel,* 870 A.2d at 790.

"[T]here is a rebuttable presumption that 'a settlement entered into by an attorney has been authorized by the client.'" *Dugan v. O'Hara*, 125 F. Supp. 3d 527, 536–37 (E.D. Pa. 2015) (quoting *Rockey v. Big Spring Sch Dist*., 699 A.2d 1331, 1334 (Pa. Commw. 1997)).

> This presumption is fundamental to the effective functioning of our adversary system which is grounded, in part, upon two interrelated understandings: (1) that attorneys speak for their clients, both to the court and to opposing counsel, and (2) that attorney-client communications are privileged. Being able to rely upon counsels' representations of their clients' positions serves the salutary purpose of avoiding intrusion into the attorney-client relationship.

*Rockey*, 699 A.2d at 1334. However, "rebuttal of the presumption will render the purported settlement ineffective." *Id*.; *see also Garabedian v. Allstates Eng'g Co., Div. of Allstates Design & Dev. Co*., 811 F.2d 802, 803 (3d Cir. 1987). "Express authority will not be found where the client has repudiated his or her counsel's authority in a timely manner after settlement." *Vangjeli v. Banks*, 668 F. Supp. 3d 400, 407 (E.D. Pa. 2023) (citing *Yarnall v. Yorkshire Worsted Mills*, 87 A.2d 192, 193 (Pa. 1952)). "A client ratifies his attorney's act if he does not repudiate it promptly upon receiving knowledge that the attorney has exceeded his authority." *Id*. Where no prompt action repudiates the settlement, the Court can find express authority. *See Dugan*, 125 F. Supp. 3d at 537.

The issue is whether Attorney One had the express authority to enter into a settlement agreement. Attorney One first proposed a settlement amount of $16,782.75 on January 10, 2025. (ECF No. 243-1, p. 7). On January 11, 2025, Attorney One was corresponding with LKRB regarding the details of the proposed settlement agreement. (*Id*. at 4). Attorney Two reached out to LKRB on January 11, 2025, requesting a settlement offer – undermining any argument that Attorney One was expressly authorized to enter into a settlement with LKRB on January 11, 2025, or January 13, 2025. (*Id*. at 13-14). Attorney One requested a settlement agreement from LKRB on January 13, 2025, at 2:39 a.m., after Attorney Two had already reached out to correspond with LKRB (*Id*. at 4). The confusion regarding which attorney represented Defendant No. 28 supports Deng's declaration that he terminated Attorney One on January 10, 2025, and retained Attorney Two on the same day. (*See* ECF No. 251-1, p. 1). Likewise, Attorney Three requested an initial settlement offer, (ECF No. 243-1, p. 17), again suggesting that Attorney One was not authorized to enter into a settlement agreement. (*See also id*. at 22 (emailing LKRB as Attorney Four to request LKRB's "settlement position")). The first time Defendant No. 28 repudiated the settlement offer was via email on March 8, 2025. (*Id.* at 28 ("Previously, I had entrusted other attorneys to communicate with you on my behalf, and they informed me that you believed we had reached a settlement agreement for $16,782.75 quite some time ago. Please see the attached document for reference. However, I was unaware of this matter entirely and am unsure if there has been a misunderstanding.")). Defendant No. 28 repeatedly stated that it was "not fully informed" about the purported settlement agreement. (*Id.* at 26 ("I understand your frustration, particularly given the prior discussions with my previous counsel and the agreement they apparently reached for $16,000, which I was not fully informed about at the time.")).

In summary, it is difficult to tell when the purported settlement agreement was formed. However, assuming that it was formed on January 13, 2025, when Attorney One requested a settlement agreement, (*see id.* at 4), Defendant No. 28 expressly repudiated the agreement via email to LKRB's counsel on March 8, 2025, (*id.* at 28). Given that, to the Court's knowledge, all communications between LKRB, Defendant No. 28, and Defendant No. 28's various attorneys have occurred via email, Defendant No. 28 timely repudiated Attorney One's authority when it contacted LKRB directly to refute the agreement within fifty-four days of the purported agreement's formation. This time period is especially reasonable when every subsequent attorney for Defendant No. 28 requested LKRB's settlement terms – further showing that Defendant No. 28 repudiated the settlement agreement and did not authorize Attorney One to settle the litigation on its behalf. Further, Deng stated that Defendant No. 28 terminated Attorney One's representation on January 10, 2025. (ECF No. 251-1, p. 7). If Attorney One did not represent Defendant No. 28 when they purportedly entered a settlement agreement with LKRB, they unequivocally did not have the express authority to enter into a settlement agreement on behalf of a client that they no longer represented. There is no evidence that Defendant No. 28 ratified the settlement agreement or was even aware of the agreement at the time that it was allegedly formed.

Based on the evidence of record and the lack of clarity regarding Attorney One's authority to settle the litigation, the Court cannot conclude that Attorney One ever had express authority to accept a settlement agreement. Express authority "must be the result of explicit instructions regarding settlement." *Tiernan*, 923 F.2d at 1033. Deng stated that Attorney One was terminated before the purported settlement agreement was ever formed. In light of that assertion, viewed in combination with Defendant No. 28's timely repudiation of the settlement agreement, the Court cannot find that Defendant No. 28 gave Attorney One explicit instructions to settle the case.

Therefore, the Court concludes that there was no express authority to accept the material terms of the proposed settlement and no enforceable settlement. *See Tiernan*, 923 F.2d at 1035.

## V.    CONCLUSION

The Court understands LKRB's frustration. Defendant No. 28's consistent switching of counsel has contributed to a lack of clarity regarding the state of the litigation between LKRB and Defendant No. 28. Nevertheless, for the foregoing reasons, the Court concludes that there was never an enforceable settlement agreement created between LKRB and Defendant No. 28. There was no mutual assent or sufficiently definite terms. And, even if such an agreement existed, Attorney One did not have the express authority to enter into the purported agreement. There is no enforceable settlement. An Order of Court will follow denying LKRB's motion.

BY THE COURT:

s/  William S. Stickman IV
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

Dated:  July 10, 2025